**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Myrna de Jesus, | No. CV-21-00926-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Dignity Health Corporation, et al., | |
| Defendants. | |

Plaintiff Myrna de Jesus ("Plaintiff"), who is proceeding *pro se*, worked as a patient care coordinator for non-party Optum360 Services, Inc. ("Optum360"). Although Plaintiff was employed by Optum360, she physically worked inside St. Joseph's Hospital and Medical Center, which is a facility owned by Defendant Dignity Health Corporation ("Dignity Health"). Plaintiff's job responsibilities included registering patients' insurance during the hospital admissions process.

In March 2021, following an incident in which Plaintiff allegedly called a Dignity Health nurse a "fucking bitch" in front of a Dignity Health patient, Dignity Health representatives spoke with (and then emailed) Plaintiff's Optum360 manager to raise concerns about this and other incidents. The next day, Optum360 fired Plaintiff.

In this action, Plaintiff asserts a defamation claim against Dignity Health and seeks $10 million in damages. Now pending before the Court are the parties' cross-motions for summary judgment. (Docs. 69, 70.) For the following reasons, Dignity Health's motion is granted, Plaintiff's motion is denied, and this action is terminated.

## BACKGROUND

I.    Facts

The following facts are derived from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.

A.    **The Alleged Incidents**

"Plaintiff worked as a Patient Care Coordinator for Optum360. . . .  Although employed by Optum360, Plaintiff physically worked at St. Joseph's Hospital and Medical Center, a Dignity Health facility." (Doc. 69 at 2 ¶ 1; Doc. 1-3 at 7.)[1]  In this role, Plaintiff "assisted hospital admissions by registering patients' insurance and worked from a mobile workstation, or 'Work on Wheels.'" (Doc. 69 at 2 ¶ 2; Doc. 78 at 4 ¶ 2 [undisputed].)

On September 16, 2020, Plaintiff received a documented "coaching" from Optum360 related to an incident that occurred the previous day.  (Doc. 69 at 2 ¶ 4; Doc. 78 at 4 ¶ 4[undisputed]; Doc. 69-1 at 45-46 ["The purpose of this coaching session is to define areas of concern in your work performance or behavior and allow you the opportunity to demonstrate improvement."].)  "The Coaching required Plaintiff to 'focus on treating all patients, coworkers, [and] leaders' with 'respect, humility,' 'compassion, and integrity,' and noted 'significant and immediate improvement' was necessary to avoid additional disciplinary action, 'up to and including termination.'" (Doc. 69 at 2 ¶ 7; Doc. 69-1 at 45-46.)[2]

As for the specifics of the underlying incident, Optum360's "Coaching Summary" form states that on September 15, 2020, a nurse, "Jackie," "had concerns with [Plaintiff]." (Doc. 69-1 at 45.)  Jackie informed Plaintiff that the "patient was not oriented and appropriate to answer admission questions" but Plaintiff said, "I am going to ask him anyways." (*Id.*)  After Plaintiff obtained the patient's signature on the intake forms, as well as other information (such as the patient's date of birth and social security number),

---

[1]    Plaintiff generally agrees but clarifies that she was later promoted to a "Compliance" position.  (Doc. 78 at 4 ¶ 1; Doc 69-1 at 50.)

[2]    Plaintiff agrees the Coaching included these requirements but characterizes it as "just a counselling not a write up."  (Doc. 78 at 5 ¶ 7.)

Plaintiff insisted to Jackie that the patient "wasn't confused and could answer questions and sign paperwork because 'I have a Masters in Psychology.'" (*Id.*)  Plaintiff disputes certain aspects of Optum360's account of the incident.  (Doc. 78 at 5 ¶¶ 5-7.)

Separately, on March 1, 2021, "a Dignity Health nurse, Lois Dracobly, verbally reprimanded Plaintiff for not wearing her mask while standing in a hallway outside the intensive care unit." (Doc. 69 at 3 ¶ 8; Doc. 69-2 at 7 [email from Dracobly describing the incident.])[3]  "Plaintiff was not wearing her mask because she was eating." (Doc. 69 at 3 ¶ 9; Doc. 78 at 6 ¶ 9 [undisputed].)  Plaintiff ignored Dracobly's request to wear a mask while she was eating, so Dracobly called security, "who asked Plaintiff to eat in the cafeteria only." (Doc. 69 at 3 ¶¶ 11-12; Doc. 78 at 6 ¶ 11-12 [undisputed].)

Dracobly also contends that, a "few weeks" before the masking incident, she and Plaintiff had another unpleasant interaction.  (Doc. 69-2 at 7.)  There, Plaintiff tried to get insurance and registration information from a family that was in the process of grieving their loved one.  (Doc. 69 at 3 ¶¶ 13-14; Doc. 69-2 at 7.)  Plaintiff generally disputes Dracobly's version of this incident.  (Doc. 78 at 6 ¶¶ 13-14.)[4]

Finally, on March 1, 2021, there was a separate incident at an elevator.  (Doc. 69 at 3 ¶¶ 15-22; Doc. 78 at 6 ¶¶ 15-22 [generally agreeing there was an incident]; Doc. 69-1 at 12 [Plaintiff's deposition testimony describing the elevator incident.].)  The exact events are contested, but generally, Plaintiff was in the elevator with her mobile unit, which took up considerable space.  (Doc. 69-1 at 13 ["I was measuring the WOW machine, kind of taking up this space, and then me standing, the bed of the patient is so long, I said, "We're

---

[3]     Although Dignity Health's motion identifies the date of this incident as March 1, 2020, this appears to be a typo, as the underlying email is dated March 1, 2021 and states that the mask-warning incident occurred "[t]his morning."  (Doc. 69-2 at 7.)  As for the substance of the incident, Plaintiff "partially agrees" with Dignity Health's description but maintains that she was "eating oatmeal" (not yogurt) and was "allowed  .  .  .  to eat anywhere" and "Defendant cannot provide any evidence that it obliged all personnel to eat at the cafeteria only, and that all must wear their masks while eating." (Doc. 78 at 5-6 ¶ 8.)

[4]     Plaintiff also argues that Dracobly "did not have a professional interaction with Plaintiff" and in fact "pushed Plaintiff on the chest."  (Doc. 78 at 6 ¶ 13.)  Plaintiff claims to have a police report from the interaction, but it was not attached as an exhibit.  (*Id.*)

not going to fit."].)  Upon arriving at the seventh floor, Plaintiff encountered three[5] nurses transporting a patient in a bed.  (*Id.*at 12-13.)  Plaintiff, knowing they would not all fit inside the elevator, asked the nurses and patient to wait for the next one.  (*Id.* at 13-14 ["So I suggested, "Do you think you guys can just wait for the other elevator to open?"].)  The nurses explained they could not wait because they were running late for surgery and asked Plaintiff if they could use the elevator.  (*Id.* ["She said, "No. We're running late. We're running late for the patient's surgery."].)

In Plaintiff's version of this incident, Plaintiff exited the elevator while muttering "dealing with idiots."  (*Id.* at 14 ["When I got off, they moved back in.  In my mind, I was more to myself, because I said, "They are not thinking.'  In my mind, I said, 'Dealing with idiots,' so I said that."].)  The nurses have a different recollection—two of the nurses, Danyelle Dodd and Daniela Lopez, recalled that Plaintiff called Dodd a "fucking bitch." (Doc. 69 at 4 ¶ 23.)[6]

### B. Dignity Health Representatives Report The Alleged Incidents To Plaintiff's Optum360 Supervisor

Dodd immediately referred the incident to her Dignity Health manager, Maureen Juilfs.  (Doc. 69 at 4 ¶ 24; Doc. 78 at 8 ¶ 24 [not disagreeing in relevant part]; Doc. 69-2 at 5 [email from Juilfs]; Doc 69-2 at 10-11 [Juilfs declaration].)  After speaking with Plaintiff, Juilfs expressed a desire to speak with Plaintiff's Optum360 supervisor, Sarah Hernandez. (Doc. 69 at 4 ¶¶ 25-27; Doc. 78 at 8 ¶¶ 25-27 [undisputed in relevant part]; Doc 69-2 at 11 ¶ 7 [Juilfs declaration].)

The group then traveled to Hernandez's office.  (Doc. 69 at 4 ¶ 28; Doc. 78 at 8 ¶ 28 [undisputed].)  Juilfs first spoke to Hernandez alone.  (Doc. 69 at 5 ¶ 29; Doc. 78 at 8 ¶ 29 [undisputed].)  Juilfs generally relayed the allegation by Dodd and Lopez—*i.e.*, that Plaintiff had called Dodd a "fucking bitch" in front of a patient.  (Doc. 69 at 5 ¶ 30; Doc.

---

[5]       Dignity Health contends there were only two nurses.  (Doc. 69 at 3 ¶ 15.)

[6]       Plaintiff agrees the allegation by Dodd was that she used the words "fucking bitch" but maintains this allegation was "fabricated."  (Doc. 78 at 7 ¶ 23.)  Plaintiff also notes there were cameras in the area that no one has produced.

69-2 at 11 ¶ 7 [Juilfs declaration: "The three of us walked to Ms. Hernandez's office.  I told Ms. Hernandez what Ms. Dodd had shared with me."].)[7]

Afterward, Dodd spoke to Hernandez for approximately 30 minutes.  (Doc. 69 at 5 ¶ 31; Doc. 78 at 8 ¶ 31 [undisputed]; Doc. 69-1 at 21 [Plaintiff's deposition testimony].)  After Hernandez finished speaking with Dodd, "Plaintiff was reprimanded and sent home by . . . Hernandez."  (Doc. 71 at 6 ¶ 2; Doc. 83 at 5 ¶ 2 [undisputed that Plaintiff was reprimanded and sent home].)

That same day, Juilfs emailed Hernandez to summarize her understanding of the meeting and the general allegations.  (Doc. 69 at 5 ¶ 33; Doc. 69-2 at 5 [email].)[8]  Dodd reviewed the email for accuracy before Juilfs sent it.  (Doc. 69-2 at 11 ¶ 8.)

Dracobly sent a separate email to Hernandez about 20 minutes after Juilfs sent her email.  (*Id.* at 7.)  Dracobly relayed the allegations concerning Plaintiff's interactions with the grieving family and Plaintiff's unmasked eating in the ICU.  (*Id.*)

Plaintiff has now identified the following 17 statements within the two March 1, 2021 emails that form the basis of her defamation claim against Dignity Health:

(a) "they asked her to please step out and allow them to take the patient down, she replied I was here first,"

(b) "proceeded to call Danyelle a F___ing Bitch,"

(c) "she pushed the down button which caused the elevator to open the door again and seem to acknowledge non-verbally that yes that is what she said,"

(d) "she was extremely aggressive,"

(e) "started arguing with my employee,"

(f) "she was told by me that this was not the time or the place for this discussion she continued to state her case loudly to which was sternly asked not to have this discussion in the hall which is when she stopped,"

(g) "she has gray, shoulder-length hair and is normally wearing an orange jacket,"

---

[7]   Although Plaintiff maintains that Dodd's account of the incident is inaccurate, she does not dispute the Juilfs relayed this account to Hernandez.  (Doc. 78 at 8 ¶ 30.)

[8]   Plaintiff maintains the allegations are false but agrees the email was sent.  (Doc. 78 at 9 ¶ 33.)

(h) "the patient's two daughters,"

(i) "I asked if I could help her and she said she needed to get insurance information and register the patient,"

(j) "I told her the patient had been here for a couple weeks and this was definitely not the time to approach family,"

(k) "she was very pushy and immediately got defensive with me,"

(l) "I asked her a few more times to please leave the family as they were grieving and it was inappropriate to approach them,"

(m) "Finally, I told her I needed her to completely leave the unit or I'd call security as she was resistant to leaving,"

(n) "I reminded her to please keep her mask on in the hospital unless she was in a breakroom, etc. where she could have it off while eating,"

(o) "She mumbled something, rolled her eyes, and put the mask over her mouth but not nose,"

(p) "She was eating a yogurt. I, again, reminded her that in public areas of the hospital we all needed to wear our masks. She said something along the lines of 'do you expect me not to eat' in which I told her that she was welcome to use our breakroom or any other to eat but if she was in the public areas of the hospital her mask needed to be on," and

(q) "that employees response to them was also disrespectful and unprofessional."

(Doc. 69-2 at 16-18 [Plaintiff's response to Interrogatory No. 1, "Identify each and every statement and/or communication which you allege constituted defamation and/or libel towards you by any employee of Dignity Health"].)

C.   **Subsequent Developments**

The following day, March 2, 2021, Optum360 terminated Plaintiff's employment. (Doc. 69 at 5 ¶ 34.)[9]

On May 12, 2021, Optum360 rejected Plaintiff's appeal of the termination decision. (Doc. 69 at 5 ¶ 36; Doc. 78 at 9 ¶ 36 [undisputed in relevant part]; Doc. 69-2 at 13 [Optum360 letter explaining basis for denial of appeal].)  Optum360's Internal Dispute

---

[9]     Plaintiff agrees she was terminated by Optum360 on March 2, 2021 but contends this was because Dignity Health requested her termination.  (Doc. 78 at 10 ¶ 34.)  To support this assertion, Plaintiff cites a subsequent letter from Optum360 explaining why her appeal of the termination decision had been denied.  (*Id.*)

Resolution ("IDR") team concluded that "several witness [sic] were able to collaborate [sic] you called another employee a 'fucking bitch' while exiting the elevator.  Your behavior violated UnitedHealth Group's Values and therefore [we] found your termination to be warranted."  (Doc. 69-2 at 13.)

Dignity Health asserts that "Plaintiff does not have any evidence that Dignity Health repeated the alleged defamatory statements to anyone but Ms. Hernandez."  (Doc. 69 at 6 ¶ 43.)  In support of this assertion, Dignity Health points to the following passage during Plaintiff's deposition:

> Q.    And the claim is that these two women told Sarah Hernandez that you
>        had said things that you didn't say, correct?
>
> A.    Correct.
>
> Q.    Who else did these two women tell, besides Sarah Hernandez, to your
>        knowledge?
>
> A.    I don't know.  Everybody talks to everybody there.  All I know, they
>        made the false allegation to Sarah.

(Doc. 69-1 at 23.)  Notwithstanding this, Plaintiff now disputes whether the dissemination of the alleged defamatory statements was limited to Hernandez, arguing that her "inability to find a job after submitting several applications to third parties, including but not limited to, prospective employers and the Arizona Department of Economic Security (denial of unemployment benefits), [is] evidence that Dignity Health's false and defamatory statements were publicized to these third parties."  (Doc. 78 at 10 ¶ 34.)

II.    Procedural History

On April 16, 2021, Plaintiff filed this action in Maricopa County Superior Court. (Doc. 1-3 at 5-14 [complaint].)

On May 26, 2021, Dignity Health timely removed this action to federal court based on diversity jurisdiction.  (Doc. 1 at 2.)

On June 3, 2021, Plaintiff filed a motion to remand (Doc. 8), which the Court denied (Doc. 11).

On March 31, 2022, Dignity Health filed its motion for summary judgment.  (Doc.

69.)  That same day, Plaintiff filed her motion for summary judgment.  (Docs. 70, 71.)  At Plaintiff's request (Doc. 72), the Court later permitted Plaintiff to file additional exhibits in support of her motion (Doc. 75).  The parties' cross-motions are now fully briefed.  (Docs. 77, 78, 82, 83, 85.)  Neither side requested oral argument.

## LEGAL STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Id.*  There is

- 8 -

no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial.").

Although Plaintiff is *pro se*, "litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1986). "The Ninth Circuit directs courts 'to make reasonable allowances for pro se litigants and to read pro se papers liberally.'" *Wilson v. JPMorgan Chase, N.A.*, 2020 WL 6262106, *2 (W.D. Wash. 2020) (quoting *McCabe v. Arave*, 827 F.2d 634, 640 n.6 (9th Cir. 1987)). However, "district courts lack 'the power to act as a party's lawyer, even for pro se litigants.'" *Id.* (quoting *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007)). *See also Bias*, 508 F.3d at 1219 ("[Plaintiff] maintains . . . that as a *pro se* litigant the district court should have searched the entire record to discover whether there was any evidence that supports her claims. We disagree. A district court does not have a duty to search for evidence that would create a factual dispute.").

## DISCUSSION

I.   Dignity Health's Motion For Summary Judgment

Dignity Health construes Plaintiff's complaint as asserting a single claim for defamation. (Doc. 1 ¶ 9; Doc. 69 at 15.) Dignity Health seeks summary judgment on that claim on three grounds. (Doc. 69.) First, Dignity Health argues it had a qualified privilege to share the allegations concerning Plaintiff's conduct with Plaintiff's supervisor at Optum360. (*Id.* at 7-10.) Second, in the alternative, Dignity Health argues that any defamation claim fails on the merits because many of the 17 challenged statements are not defamatory, Plaintiff has no evidence to establish fault, and Plaintiff cannot establish harm. (*Id.* at 10-14.) Third, Dignity Health argues that, at a minimum, Plaintiff's allegations do not support an award of punitive damages. (*Id.* at 14-15.)

As explained below, the Court agrees with Dignity Health as to the first issue, which is dispositive, and thus declines to reach the other two.

…

…

…

1

2

     A.     **Common Interest/Qualified Privilege**

        1.    The Parties' Arguments

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

    Dignity Health argues it had a qualified privilege under Arizona law to share its concerns about Plaintiff with Optum360 because "Plaintiff was an Optum360 employee working inside of a Dignity Health facility, and working directly with Dignity Health patients." (Doc. 69 at 8.) Dignity Health continues: "Dignity Health and Optum360 naturally had a common interest in Plaintiff's job performance. As a result, Optum360 was entitled to learn that Plaintiff had used extremely inappropriate and unprofessional language in front of a patient." (*Id.*) Dignity Health further contends that it did not abuse its qualified privilege by acting with "actual malice" or "excessive publication." (*Id.* at 8-10.) As for the former, Dignity Health contends that Plaintiff "presented no evidence that Dignity Health knew its statements were false or had serious doubts as to the truth." (*Id.* at 9.) As for the latter, Dignity Health contends that Plaintiff cannot "show that Dignity Health excessively published its allegations, or even that it made the statements to anyone but Ms. Hernandez." (*Id.*) Dignity Health concludes by emphasizing that "Plaintiff's insistence that the statements were false is not enough to establish the requisite level of fault" and notes that, in any event, it "took care in attempting to determine the truth of the statements before conveying its concerns to Optum360." (*Id.* at 9-10.)

19

20

21

22

23

24

25

26

27

28

    In response, Plaintiff acknowledges that "both Dignity Health and . . . Optum360[] have a common interest in effective hospital management *independently*" but argues that "Defendant and Plaintiff's employer do not share a common interest in providing quality patient care" because Optum360 is focused on "Revenue Cycle (billing) and health care insurance coverage while that of Defendant is patient care." (Doc. 78 at 2.) Plaintiff further contends that Dignity Health acted in bad faith. (*Id.* at 12.) She asserts that when Juilfs "demanded from Plaintiff to see her supervisor," Plaintiff was under the impression that the "three of them" would be discussing the elevator incident. (*Id.*) However, Juilfs and Dodd spoke with Hernandez for "almost an hour" and then "left . . . without hearing the Plaintiff's side." (*Id.*) Plaintiff concludes that those actions evidence "bad faith for being

deceitful to Plaintiff." (*Id.*)  Plaintiff also appears to argue that Dignity Health acted with actual malice because of "major factual inaccuracies and changes" as well as "deliberate alteration[s]" to the "original version of allegations against Plaintiff." (*Id.* at 12-13.)  For example, Plaintiff notes that Dodd first alleged that Plaintiff "screamed the words 'fucking bitch' in the presence of several witnesses, nursing students, other patients, medical students, medical doctors, and other hospital personnel," which was then changed to "Ms. Dodd stated that Ms. Lopez and the patient heard the 'remark' as well." (*Id.* at 12-13.) Finally, Plaintiff argues that Dignity Health acted with "ill will" by making "excessive and exaggerated" allegations. (*Id.* at 14.)  In closing, Plaintiff asserts that "the onus probandi now shifts to Defendant to show to this Court that its actions and statements are truthful and not defamatory." (*Id.* at 16.)

In reply, Dignity Health contends that "[a]s an initial matter, Plaintiff's Response fails to follow the Court's rules.  Her responses to Dignity Health's Statement of Facts ('DSOF') frequently fail to cite to the record, or any evidence, to support her contention that the fact is, in fact, disputed." (Doc. 82 at 1.)  Turning to the merits, Dignity Health argues that Plaintiff "does not present sufficient law or facts to rebut Dignity Health's claim of the common interest privilege." (*Id.* at 2.)  Dignity Health reiterates that the common interest privilege applies to two entities that share the same "goal" with regard to patients, irrespective of whether they also share the same "role." (*Id.* at 2-3.)  Next, Dignity Health argues that, even viewing the evidence in the light most favorable to Plaintiff, she "fails to present clear and convincing evidence that Dignity Health *knew* the falsity of its statements or had *serious doubts* as to their truth." (*Id.* at 4.)  Dignity Health notes that Plaintiff herself admitted that "Optum360, not Dignity Health, excluded Plaintiff from its conversation with Dignity Health personnel" (*id.* at 4); argues that any of the supposed alterations identified by Plaintiff are not "material" and even if they were, Plaintiff has offered no evidence of Dignity Health's intent (*id.* at 5); argues that even if the statements were defamatory *per se* (which Dignity Health maintains they are not), Plaintiff is still required to show fault and she "has failed to assert any facts upon which a jury could find actual malice" (*id.* at 6);

and argues that Plaintiff has no "admissible evidence that anyone at Dignity Health requested or directed the termination"  (*id.* at 6-7).

   2.   **Analysis**

Arizona "follows the Restatement (Second) of Torts . . . on claims relating to defamation of a private person." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015).  Under the Restatement, "[t]o create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Restatement (Second) of Torts § 558. "Publication for defamation purposes is communication to a third party." *Dube v. Likins*, 167 P.3d 93, 104 (Ariz. Ct. App. 2007).

As for the second element of this test, Dignity Health does not dispute that it published the alleged defamatory statements to a third party, Hernandez, but contends this publication was privileged because it fell within the "common interest" privilege.  (Doc. 69 at 7.)  "Whether a privileged occasion arose is a question of law for the court, and whether the occasion for the privilege was abused is a question of fact for the jury." *Green Acres Tr. v. London*, 688 P.2d 617, 624 (Ariz. 1984).

   a.   <u>Common Interest</u>

Arizona recognizes the "common interest" privilege, which arises when "one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them."  *Green Acres*, 688 P.2d at 625 (quoting Restatement (Second) of Torts § 596, cmt. c).  "This privilege applies in a context like associates in a commercial enterprise, users of mercantile agencies, co-owners of property, or co-members of the board of trustees of a school district."  *Id.* (internal citations omitted).  "In these contexts, each participant in the association, group or organization depends on other participants to supply relevant information.  Through the qualified privilege, courts facilitate the exchange of information by protecting statements about matters affecting the

goals of that organization or group."  *Id.*

In *Green Acres*, the Arizona Supreme Court found there was no common interest between an attorney and a news reporter in providing details of an upcoming class action lawsuit against a retirement home.  *Id.* at 626 ("Although it may be true in a loose sense that the reporter and the lawyer defendants shared a 'common interest' in the plight of the elderly, this is not the kind of interest that gives rise to a common undertaking which compels protection from a defamation action.").  In contrast, in *Miller v. Servicemaster By Rees*, 851 P.2d 143 (Ariz. Ct. App. 1992), the plaintiff (a man named Miller) was employed by an unnamed company that utilized a janitorial services company (Servicemaster).  *Id.* at 144-45.  Servicemaster, in turn, employed a woman named Powers.  *Id.*  After Powers reported to Servicemaster that Miller had sexually harassed her while she was cleaning Miller's office, Servicemaster relayed this allegation to Miller's employer.  *Id.*  Miller, in turn, sued Servicemaster for defamation, under the theory that "the written and verbal reports of the incident are defamatory as a matter of law because they adversely damaged his professional reputation," but the Arizona Court of Appeals held that Servicemaster was protected by the common interest privilege because "public policy dictates that employees must be protected from workplace sexual harassment" and "Powers' report and Servicemaster's transmittal of that report to [Miller's] employer were for the benefit of protecting her from unwanted harassment, real or perceived."  *Id.* at 145.  Similarly, in *Hirsch v. Cooper*, 737 P.2d 1092 (Ariz. Ct. App. 1986), the court found that the common interest privilege applied when a corneal surgeon questioned the competence of another provider in treating his patient while in discussions with a foundation that would be paying for the patient's surgery.  *Id.* at 1095-96.  This was because the "discussion concerned the future care of the patient and involved matters of a 'common interest.'"  *Id.*

Even construing the evidence in the light most favorable to Plaintiff, Dignity Health and Optum360 shared a common interest in hospital management and patient care.  (Doc. 69 at 8.)  It is undisputed that "[a]lthough employed by Optum360, Plaintiff physically worked at St. Joseph's Hospital and Medical Center, a Dignity Health facility."  (Doc. 69

at 2 ¶ 1; Doc. 78 at 4 ¶ 1.)  Plaintiff further does not dispute that part of her role was assisting "hospital admissions by registering patients' insurance."  (Doc. 69 at 2 ¶ 2; Doc. 78 at 4 ¶ 2.)  Although Plaintiff asserts that she has "no obligation to perform quality patient care and is only responsible to do compliance" (Doc. 78 at 4 ¶ 3; Doc 77-1 at 27 [outlining Plaintiff's job training online courses]), the coaching that Plaintiff received from Optum360 in September 2020 specifically raised performance concerns relating to Plaintiff's inappropriate interactions with a Dignity Health patient and a registered nurse.  (Doc. 69-1 at 45.)  The coaching also called for Plaintiff to "focus on treating all patients, coworkers, leaders, anyone that she comes in contact with during her working hours with the above values in mind.  Specifically focusing on relationships, compassion, and integrity."  (*Id.* at 46.)  Taken together, the shared workspace, the regular interactions with Dignity Health's patients and staff, and Plaintiff's performance metrics based on interactions with Dignity Health's patients and staff demonstrate that Dignity Health and Optum360 shared a common interest in hospital administration and patient care.  The situation here has many obvious parallels to the situations in *Miller* and *Hirsch*, and in both of those cases a common interest was found to exist.

The Restatement also contemplates the existence of a common interest in this situation.  Although Plaintiff did not work *for* Dignity Health, she worked in one of its facilities, and Juilfs and Dracobly made statements that drew attention to potentially inappropriate behavior by Plaintiff directed at other staff members and in front of a patient.  Restatement (Second) of Torts § 596 cmt. c (noting that "a partner is entitled to be told not only of the discharge of an employee by his fellow partner but also of the reasons for his discharge, and the fellow partner is conditionally privileged to state the reason even though it reflects upon the conduct or character of the employee in question" and that "[i]n many instances, the common interest makes proper the communication of defamatory matter that has prompted certain action on the part of one of the parties although it has subsequently been discovered that the matter was false").  The Court thus has little trouble concluding that Dignity Health had a conditional privilege to communicate to Optum360 the

allegations regarding Plaintiff's inappropriate interactions with Dignity Health employees and patients and regarding Plaintiff's potential violations of Dignity Health's Covid protocols, because such allegations implicated Dignity Health's and Optum360's common interests.

Given this determination, the burden shifts to Plaintiff to show "abuse of that privilege either by proving publication with 'actual malice' or by demonstrating excessive publication." *Green Acres*, 688 P.2d at 624 (citing Restatement (Second) of Torts § 604, cmt. a). "This is a question for the jury, but where there is no evidence . . . the court can dispose of the issue." *Aspell v. Am. Cont. Bridge League of Memphis, Tenn.*, 595 P.2d 191, 193 (Ariz. Ct. App. 1979).

### b.  Excessive Publication

"Abuse through excessive publication results from publication to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Green Acres*, 688 P.2d at 624 (internal citations omitted).

Plaintiff's only argument on this point is that her "inability to find a job after submitting several applications to third parties" is "evidence that Dignity Health's false and defamatory statements were publicized to these third parties." (Doc. 78 at 10.) This argument lacks merit. As Dignity Health points out, "Plaintiff's inability to obtain employment does not prove publication, let alone excessive publication." (Doc. 82 at 4 n.2.) Notably, none of the materials submitted by Plaintiff indicate that the employers who rejected her job applications were even aware of the allegations that Dignity Health previously relayed to Hernandez. (Doc. 73-2 at 22 [Phoenix Children's]; Doc. 73-2 at 24 [Mayo Clinic]; Doc. 77-1 at 20 [Plaintiff earned no unemployment benefits in 2021]; Doc. 70 at 27 [unemployment claim was not in "active status"].) Additionally, during her deposition, Plaintiff admitted that she could only speculate as to whether the allegations had been relayed to others beyond Hernandez. (Doc. 69-1 at 23.) On this record, there is simply no evidence from which a reasonable juror could conclude that Dignity Health publicized the allegations beyond Hernandez. *See generally Barnes v. Arden Mayfair, Inc.*,

759 F.2d 676, 680 (9th Cir. 1985) ("A party opposing summary judgment is entitled to the benefit of only reasonable inferences that may be drawn from the evidence put forth.  The district court must therefore undertake some initial scrutiny of the inferences that could be reasonably drawn from the evidence.  A reasonable inference is one which supports a viable legal theory, which by necessary implication cannot be supported by only threadbare conclusory statements instead of significant probative evidence.") (cleaned up).

> c.   Actual Malice

"An abuse through 'actual malice' occurs when the defendant makes a statement knowing its falsity or actually entertaining doubts about its truth."  *Green Acres*, 688 P.2d at 624.  In other words, "[m]alice is established by showing that [the defendants] acted in reckless disregard of the truth, or with actual knowledge that their statements were false." *Aspell*, 595 P.2d at 193.  "Actual malice, however, is not established through a showing of bad motives or personal ill-will."  *Heuisler v. Phx. Newspapers, Inc.*, 812 P.2d 1096, 1100 (Ariz. Ct. App. 1991).  "In a defamation case, if the factual dispute concerns actual malice, the trial court's summary judgment inquiry is 'whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.'"  *Id.  See also Wietecha v. Ameritas Life Ins. Corp.*, 2006 WL 2772838, *11 (D. Ariz. 2006) (applying the clear and convincing evidence standard to whether a defendant acted with malice in a qualified privilege context).

Plaintiff's first argument is that Dignity Health acted in "bad faith."  (Doc. 78 at 12.)  As Dignity Health points out, that is the incorrect standard in this context.  (Doc. 82 at 4 n.3.)  At any rate, Plaintiff's argument is based on the allegation that when Juilfs "demanded from Plaintiff to see her supervisor," Juilfs gave the impression that the "three of them" would be discussing the elevator incident with Hernandez, yet Plaintiff was not included in the conversations that immediately followed.  (Doc. 78 at 12.)  This allegation, even if true, is not a basis for denying summary judgment because "[i]t is well established that 'failure to investigate, sloppy investigation, poor reporting practice and the like are not

per se actual malice.'" *Heuisler*, 812 P.2d at 1101 (citation omitted).   Additionally, Plaintiff agrees that significant conversations took place between Dodd/Juilfs and Hernandez, suggesting there was some investigation into the allegations.   Under these circumstances, a reasonable juror could not conclude (let alone conclude subject to the heightened clear-and-convincing evidence standard) that Dignity Health acted in reckless disregard for the truth when communicating Dodd's version of the incident to Hernandez. *Aspell*, 595 P.2d at 193 ("Nor does the evidence, viewed in the light most favorable to appellant, show that the board had a reckless disregard for the truth. . . .   The minutes state that the board discussed the situation for over an hour.").

Plaintiff's argument may be that Juilfs misled her into believing she would be part of the discussion with Hernandez.   (Doc. 78 at 9 ["Defendant's OR nurse Juilfs and attendant Dodd were treacherous and deceptive; they left the Patient Access office without informing the Plaintiff."].)   However, Plaintiff admits that Hernandez, her Optum360 supervisor, is the one who excluded her from the conversation.   (*Id.* at 8 ["Sarah Hernandez excluded Plaintiff in their discussion."].)   Therefore, this allegation, even if true, is not material on the issue of actual malice.

Plaintiff also alleges that Dodd had the "opportunity to verify with Plaintiff if Plaintiff really screamed" "fucking bitch" before the walk to Hernandez's office, but "Dodd did not because she was fully aware of the falsity of her statements."   (Doc. 78 at 8.)   But this argument is wholly speculative—it is premised on Plaintiff's attempt to read Dodd's mind and discern why Dodd failed to engage in a follow-up conversation with her. Such speculation is not clear and convincing evidence of actual malice.

Plaintiff next argues that the "deliberate" and "major" factual inconsistencies in the statements show a reckless disregard for the truth.   (Doc. 78 at 12-13.)   Specifically, Plaintiff points to the following inconsistencies: (1) the initial allegation that Plaintiff "screamed the word 'fucking bitch' in the presence of several witnesses, nursing students, other patients, medical students, medical doctors, and other hospital personnel" versus the later statement that Dodd and Lopez merely heard Plaintiff "call[ing] Danyelle [Dodd]"

fucking bitch in front of one patient; (2) the allegation that there were only two attendants with the hospital bed when there were actually three; (3) some of the allegations were removed in Juilfs's email; and (4) Juilfs added new allegations to the email, such as Plaintiff "insisted that nurses and patient should wait for the next elevator." (*Id.*)

As Dignity Health correctly notes, it is difficult to cast these "alterations" as either material or relevant to the issue of malice. (Doc 82 at 5.) Whether there were two nurses or three present does not affect "the substance, the gist, [or] the sting of" the original accusation that Plaintiff said "fucking bitch" to a nurse in front of a patient. *Fendler v. Phx. Newspapers Inc.*, 636 P.2d 1257, 1261 (Ariz. Ct. App. 1981). And there is no evidence that any of the changes were made with a "reckless disregard for the truth." In fact, it appears the alterations are more restrained versions of the originals, which if anything suggests they were not made with actual malice. Accordingly, the purported contradictions and inconsistencies do not qualify as evidence (let alone clear and convincing evidence) from which a reasonable juror could find actual malice.

Plaintiff next argues that the allegations against her were "excessive and exaggerated." (Doc. 78 at 14.) However, the standard Plaintiff cites (relating to "ill will") is not the law in Arizona.[10] (*Id.*) At any rate, the allegations Plaintiff cites as problematic are that she was "extremely aggressive," "disrespectful," has "gray shoulder length hair and is normally wearing a normal jacket," and was "unprofessional." (Doc. 78 at 14; Doc. 69-2 at 5 [Juilfs email: "When I went to speak to her regarding this situation she was extremely aggressive and started arguing with my employee and when she was told by me that this was not the time or the place for this discussion she continued to state her case loudly to which she was sternly asked not to have this discussion in the hall which is when she stopped and we proceeded to her manager's office."]; *id.* at 7 [Dracobly email: "The

---

[10]      The Court notes that Plaintiff has cited A.R.S. § 12-653.01, which defines actual malice as "that state of mind arising from personal spite, hatred, or ill will toward the plaintiff, but such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice." That provision's definitions only apply in the context of "damages for the publication of a libel in a newspaper or magazine, or of a slander by radio or television broadcast." A.R.S. § 12-653.02.

employee would not give me or the security guard her name this morning during our interaction.  She has gray, shoulder-length hair and is normally wearing an orange jacket. . . . Upon returning to the unit I was informed by our security staff that the employees response to them was also disrespectful and unprofessional."].)  Not only does Plaintiff fail to explain how these statements are exaggerated, but Plaintiff fails to explain how the exaggeration could qualify as clear and convincing evidence of actual malice—*i.e.*, a reckless disregard for the truth.[11]  Given that it is undisputed that Hernandez gave significant time to Dignity Health's employees to explain the situation, Plaintiff's speculative evidence does not demonstrate that she could meet the clear and convincing evidence hurdle.  Even if these statements vary slightly from Plaintiff's own recollection of the events, this does not create a genuine issue of material fact about whether the statements were made with actual malice.[12]

Plaintiff also argues that many of the statements were defamatory per se.  (Doc. 78 at 14-15.)  But even assuming that some of the challenged statements could be categorized in this fashion, which is unlikely,[13] Dignity Health's defense is that it had a privilege to relay those statements to Hernandez.   Statements that would otherwise constitute defamation per se are not actionable if the publication was privileged.  *McClinton v. Rice*, 265 P.2d 425, 430 (Ariz. 1953) ("*Unless the publication in the instant case was privileged or qualifiedly privileged*, the proof of publication of the article carried with it the presumption of its falsity . . . .") (emphasis added).  Similarly, whether the statements touched on the subject matters that might trigger the defamation per se doctrine is distinct from whether Plaintiff can show they were made with actual malice.

---

[11]    Plaintiff does not dispute that these events occurred, only how they have been characterized.  (Doc. 78 at 5, 13.)

[12]    Plaintiff has submitted a black-and-white photo of herself, which shows her hair as shoulder length.  (Doc. 70 at 10.)  Even if the photo made clear that Plaintiff's hair is not gray, this would not create a material dispute as to whether Dignity Health acted with actual malice.

[13]    "An utterance is slander Per se when its publication charges a contagious or venereal disease, or charges that a woman is not chaste, or tends to injure a person in his profession, trade or business, or imputes the commission of a crime involving moral turpitude." *Modla v. Parker*, 495 P.2d 494, 496 n.1 (Ariz. Ct. App. 1972).

Finally, Plaintiff contends that Dignity Health asked to have Plaintiff fired, which constitutes actual malice. (Doc. 78 at 4 ["Defendant, to make sure that its malicious request is materialized, made a willful presence in the office of Sarah Hernandez, and witnessed Ms. Hernandez pronouncing her derogatory statements to Plaintiff"]; *id.* at 9 ["On March 2, 2021, Plaintiff was terminated based on Defendant's management request to remove Plaintiff."].) Putting aside that there is no admissible evidence that Dignity Health asked for Plaintiff to be fired—although Plaintiff *asserts* that Hernandez admitted to her that Dignity Health made such a request (Doc. 77-1 at 13), Dignity Health correctly points out that "Plaintiff's assertions about what Ms. Hernandez told her constitute inadmissible hearsay" (Doc. 82 at 8 n.5)[14]—such a request would not qualify as evidence of actual malice in any event. *Heuisler*, 812 P.2d at 1100 ("[E]vidence tending to show that Murphy may have had a personal motive to deprive Heuisler of the appointment, although perhaps relevant to show spite or ill-will amounting to common law malice, would not establish knowledge of falsity or reckless disregard for the truth, the defining characteristics of actual malice . . . .").

II.     Plaintiff's Motion For Summary Judgment

Plaintiff argues she is entitled to summary judgment because Dignity Health "deliberately violated First (1st) Amendment of the US Constitution, A.R.S. § 12-541, § 12-651, § 12-653.01, and Arizona Constitution, Art. 2, Sec. 4, including contemporary, exemplary, and punitive damages, which all of these bundled together as $10,000,000.00 plus cost." (Doc. 70 at 2.) Additionally, in her motion papers, Plaintiff seems to make references to claims for intentional infliction of emotional distress (Doc. 71 at 14) and tortious interference with contract (Doc. 85 at 11).

Even liberally construed, Plaintiff's complaint only raises a state-law defamation claim. (Doc. 1-3 at 9-11.) Nor is there any evidence that Plaintiff ever disclosed her intent to pursue some sort of claim other than a state-law defamation claim. (*See, e.g.*, Doc 10 at

---

[14]     The only admissible evidence in the record on this point is Juilfs's declaration, in which Juilfs avows that "I did not ask Ms. Hernandez to fire Plaintiff." (Doc. 69-2 at 11 ¶ 9.)

4 [in the portion of the Rule 26(f) report requiring Plaintiff to provide a "description of each claim, defense, and affirmative defense," Plaintiff wrote: "Plaintiff brings a claim for defamation/slander against Dignity Health Corporation"].)  Accordingly, the Court limits its analysis to Plaintiff's defamation claim.[15]

### A.   The Parties' Arguments

In her motion for summary judgment, Plaintiff makes many of the same arguments she made in her response to Dignity Health's motion.  (Doc. 71 at 10 [arguing that the challenged communications were "slanderous and libelous per se"]; *id.* at 11 [arguing that Dignity Health cannot assert a qualified privilege because it acted "with malice in fact"]; *id.* at 12 [arguing that Dignity Health "ha[d] full knowledge of the falsity of its statements after making deliberate alteration of material facts and exhibition of major factual inaccuracies"].)  Because those arguments are addressed on the merits in Part I above, the Court will not address them again here.

Plaintiff also seems to advance several additional arguments in support of her affirmative request for summary judgment.  First, Plaintiff contends that actual malice is only required if the challenged statement addressed a matter of public concern, which is not the case here, and there is "prima facie evidence of actual malice on the tortious conduct of the Defendant."  (*Id.*)  Second, Plaintiff contends that Dignity Health's statements, under any plain interpretation, impeach her "honesty, integrity, or reputation" and thus constitute libel per se.  (*Id.* at 13-14.)  In a related vein, Plaintiff contends that Dignity Health's "false allegations are defamation *per se* as [they] stigmatize[] the Plaintiff as guilty of unprofessionalism and lack of work ethics."  (*Id.* at 14.)  Finally, Plaintiff argues that

---

[15]   The Court further notes that Plaintiff does not explain how Dignity Health acted under color of state law, as required for a First Amendment claim.  *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983) ("In order to state a claim under 42 U.S.C. § 1983, [plaintiffs] must show two essential elements: (1) that the defendants acted under color of state law; and (2) that the defendants caused them to be deprived of a right secured by the constitution and laws of the United States.").  As for Plaintiff's statutory citations, A.R.S. § 12-541 simply identifies the statute of limitations for libel and slander, A.R.S. § 12-561 provides certain definitions to be used in a medical malpractice action, and A.R.S. § 12-653.01 applies only to broadcast television station retractions.  Accordingly, those statutes could not provide an independent pathway to liability here.  Neither could the due process clause of the Arizona Constitution.

Dignity Health cannot be protected by the "Constitution's First Amendment on freedom of speech, nor can the Defendant raise the doctrine of fighting words to protect itself." (*Id.* at 14-15.)

In response, Dignity Health argues that Plaintiff has "not produce[d] sufficient evidence to establish, without genuine dispute, the elements of her defamation claim." (Doc. 83 at 1-2.)  According to Dignity Health, "Plaintiff's insistence that Dignity Health failed to prove the 'truth' of its statements confuses the issue: it is Plaintiff who must establish the statements were false."  (*Id.* at 2.)  Finally, Dignity Health argues that "even if the Court finds Plaintiff met her burden as to Dignity Health's liability, Plaintiff produced no supportive evidence for punitive damages; at a minimum, the Court should deny Plaintiff summary judgment on this relief."  (*Id.* at 2.)

In reply, Plaintiff first argues that Dignity Health's response is untimely.  (Doc. 85 at 1.)  Next, Plaintiff argues that Dignity Health has distorted several facts without any citations to record evidence.  (*Id.* at 2-3.)  As for Dignity Health's substantial truth defense, Plaintiff contends that Dignity Health "DID NOT provide any evidence, not one, not even a statement from any lone witness, so to prove the truthfulness to all its accusatory allegations against Plaintiff."  (*Id.* at 3.)  Additionally, Plaintiff argues that Dignity Health has disregarded its burden to prove truth by a preponderance of the evidence.  (*Id.* at 7-8.)  Plaintiff further argues that various pieces of circumstantial evidence show that the allegations against her were false (*id.* at 8-9), that Dignity Health's objections to her exhibits are "unacceptable" under Federal Rule of Evidence 402 (*id.* at 5-6), and that punitive damages are "assumed after Plaintiff established well the evil intent of the Defendant and the inflicted injuries she suffered" (*id.* at 6).  In conclusion, Plaintiff argues that she proved her prima facie case by demonstrating that (1) Dignity Health failed to prove the truth of the statements, (2) Dignity Health's "accusatory allegations are defamatory per se as it immediately injured Plaintiff's character and caused her immediate termination," (3) "Dignity Health's defamatory statements were publicized to Plaintiff's prospective employers, employment agencies, AZ Dept. of Securities, and alma mater

schools," (4) Dignity Health "clearly exhibited reckless disregard of the truth, because having full knowledge of the falsity of its allegations, with an evil mind, intentionally alleged falsehoods, by phone call, email, reported in person, and made an in-person requests for her immediate removal at work which directly defamed Plaintiff," and (5) Dignity Health's "defamatory falsehoods were resulted directly to Plaintiff's immediate sufferings of complete economic losses, loss wages, incapacitated to pay all her debts and credit cards, lost company benefits, maintain a sustainable life, lost medical health benefits, unemployment benefits, and other consequential damages." (*Id.* at 9-12.)

B.      **Analysis**

Under Local Rule 7.2(c), a party generally has 14 days to file a response to a motion, subject to the exceptions in Local Rule 56.1.  Local Rule 56.1(d), in turn, specifies that a party has 30 days to file a response to one particular type of motion—a motion for summary judgment.

Plaintiff's summary judgment motion was filed on March 31, 2022.  (Doc. 70.) Federal Rule of Civil Procedure 6(a)(1), which governs the computation of time, explains that the Court shall exclude the day of the event that triggers the period and that if the final day of the period is a Saturday, Sunday, or legal holiday, then the period "continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."  Here, the 30th day after March 31, 2022 was April 30, 2022, which was a Saturday.  Accordingly, Dignity Health's response was not due until the following Monday, May 2, 2022.  This was the day that Dignity Health filed its response.  (Doc. 83.)  It follows that Dignity Health's response was timely.

Turning to the merits, any defamation claim against Dignity Health fails based on application of the common interest privilege for the reasons stated in Part I above.  Nothing in the briefing related to Plaintiff's affirmative summary judgment motion undermines this conclusion.

…

…

Accordingly,

**IT IS ORDERED** that Dignity Health's motion for summary judgment (Doc. 69) is **granted** and Plaintiff's motion for summary judgment (Doc. 70) is **denied**.

**IT IS FURTHER ORDERED** that the Clerk enter judgment accordingly and terminate this action.

Dated this 18th day of January, 2023.

Dominic W. Lanza
United States District Judge